*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

FARAJ MORRIS,

        Defendant-Appellant.

UNPUBLISHED
May 23, 2024

No. 363129
Wayne Circuit Court
LC No. 19-005635-01-FC

Before: MALDONADO, P.J., and PATEL and N. P. HOOD, JJ.

PER CURIAM.

Defendant Faraj Morris appeals as of right his jury trial convictions of first-degree premeditated murder, MCL 750.316(1)(a), assault with intent to commit murder, MCL 750.83, felon in possession of a firearm (felon-in-possession), MCL 750.224f(1), and three associated counts of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. The trial court sentenced Morris as a third-offense habitual offender, MCL 769.11, to concurrent prison terms of life without parole for the murder conviction, 25 to 50 years for the assault conviction, and 4 to 10 years for the felon-in-possession conviction, to be served consecutive to three concurrent two-year terms of imprisonment for the felony-firearm convictions. We affirm.

## I. BACKGROUND

This case arises from Morris's convictions for the June 8, 2019 shooting death of Ronald Anderson and the nonfatal shooting of Edward Pruitt outside a bistro located at the intersection of Lesure and McNichols in Detroit. At trial, there was evidence that Anderson and his friends, Kahlil Elledge and Paulton Grant, were inside the bistro where Morris and his friends were also present. At some point, Anderson and one of Morris's friends had a verbal altercation, and employees removed Morris's friend from the bistro. Morris subsequently left the bistro and was standing outside with three other people when Anderson and his friends exited. When Elledge arrived at his car, which was parked down the street from the bistro, he saw Anderson walking backward down the sidewalk, away from Morris, as the two men were talking.

Meanwhile, Pruitt, who had just parked in the area, began walking toward the bistro (up Lesure, toward McNichols) and saw Anderson walking backward in his direction, away from a group on the corner. Pruitt did not know Anderson or Morris. He did not hear Anderson make any threats; rather, he testified that he heard Anderson say, "Leave me alone" and "I'm done arguing," while walking away. He also testified that he heard Morris say, "We have guns," "There's shooters," and "There's no bitches around here." Morris then pulled out a gun, pointed it at Anderson, and shot one time, missing Anderson but striking Pruitt in the leg. After a brief pause, Morris raised his gun again and fired two or three more times, striking Anderson in the chest. Elledge testified to seeing the shooting. Pruitt heard one gunshot, but did not see where it came from because he hit the ground. He heard two or three more shots before seeing Anderson fall to the ground.

Surveillance video from the bistro captured the shooting and was admitted at trial. The video depicts Anderson standing on a side street (Lesure) near the intersection with a busy road (McNichols) for approximately four minutes prior to the shootings. Immediately prior to interacting with Morris, Anderson appeared to be waiting in the shadowed corner off on the side of the bistro. At 10:28:40 p.m.,[1] he appeared to interact with someone who is out of view on the main road. At 10:28:44, Morris and another man came from around the corner into view. At 10:28:53, Morris backed up with his body partially covered behind the corner of the building while the other man stood in full view and continued to interact with Anderson. From the moment Morris and the other man came into view until approximately 10:29:20 (approximately 30 seconds), Anderson backed away from the men while continuing to interact with them. At 10:29:29, Morris pivoted his body from around the corner, raised the gun, and fired a single shot. This was the shot that struck Pruitt. He then lowered the gun. At 10:29:33 Anderson began to backup again but did not start running away. At the same time, Morris pivoted back to cover more of his body behind the corner of the building. At 10:29:36 he fired again, hitting Anderson and apparently causing his legs to buckle. After the shooting, Morris walked away from the bistro down McNichols while the other man entered a vehicle that had been idling at the corner from the start of the video before driving off. Pruitt and Elledge both testified that Morris was the only person they saw with a gun, and only Morris is depicted in the video as being armed.

During the trial, the prosecution presented forensic evidence, specifically police officers testified that they located spent shell casings on Lesure, "just off McNichols" outside the bistro. The responding officers did not find any other shell casings in the general surrounding area. But one of the forensic technicians responsible for photographing and collecting evidence from the scene testified that he found three .40-caliber Smith & Wesson shell casings on Lesure Street (near where the shooting happened), and a .38-caliber bullet on the other side of the street.[2] The forensic

---

[1] We cite the timestamp indicated on the video for temporal reference only. It is unclear if the timestamp accurately reflected the time of day.

[2] A bullet, which is part of a cartridge or round, is the projectile that comes out of a barrel after a round is expended. A casing, is another part of a cartridge or round, specifically, the part that houses other components, contains the propellant powders, and attaches to the projectile (i.e., bullet) at the front of the cartridge. A cartridge or round is the bullet and propellent (i.e., the live

technician could not determine how long the bullet had been there before it was collected, nor did he know how it got there.

Morris testified in his own defense, asserting that he acted in self-defense when he shot Anderson. He testified that as he was quarreling with Anderson, Elledge emerged from behind a building, raised a handgun, and shot at him. Morris was scared, so he returned fire, accidentally shooting Pruitt and then Anderson. Morris admitted using a .40-caliber weapon, and the defense asserted that the recovery of a .38-caliber bullet in the general area supported his self-defense claim.

After the shooting, Morris walked around the nearby ice cream shop, "hop[ped] a few gates," ran down the alley, left the area, and called a cab. He testified that he did not stay to talk to the police because "it's still an armed man there[.]" On direct examination, after one of his attorneys asked why he did not go to the police station, Morris testified, "I don't too much trust the police too much, wrongful convictions and stuff going on. And I'm a felon, so I already knew that was going to be a strike against me." On cross-examination, the prosecutor also questioned Morris about why he did not go to the police or otherwise share his story prior to trial. On appeal, Morris highlights the following exchange between him and the prosecutor:

> *Q*. Okay. And about how many minutes did you travel from the [bistro] to the house you're staying at?
>
> *A*. Probably, 7 minutes, 8 minutes.
>
> *Q*. Okay.
>
> *A*. Not long
>
> *Q*. Okay. Do you ever think to go to tell the police, I just got shot and I'm terrified, is what you said?
>
> *A*. Right.
>
> *Q*. Or you said you were—I'm sorry—not terrified. You said you were traumatized; right?
>
> *A*. Right.
>
> *Q*. That's what you said. So you never tell police?
>
> *A*. No, [m]a'am.

---

ammunition that has yet to be fired). Most pistols, when fired, eject the spent casing through the top or side of the pistol, while propelling the bullet through the barrel of the pistol in the direction the shooter is aiming.

*Q*. Okay. And you never tell anyone until today in court in front of a jury, right, that someone shot at you?

*A*. No.

At that point the defense objected, and after a brief sidebar, the court sustained the objection and indicated that the prosecutor could not ask that question. The defense did not move to strike the prior answer.

In addition to Morris, the defense called the officer in charge and recalled Elledge, who previously testified in the prosecution's case. The defense did not call any other witnesses despite listing several other witnesses on its witness list.

In its rebuttal case, the prosecution called Michigan State Police Lieutenant Jeffrey Amley, who was qualified as an expert in the field of firearm and toolmark identification. Lt. Amley examined the three .40-caliber Smith & Wesson fired cartridge casings that were collected from the scene and determined that they were fired from the same weapon. He also examined two spent bullets and a spent bullet fragment and concluded that one of the spent bullets was .40 caliber, one bullet was .38 caliber, and the bullet fragment was consistent with being a .40-caliber bullet. He eliminated the recovered .38-caliber bullet as having been fired from the same "firearm barrel" used to fire the .40-caliber bullets. On the basis of the ballistics evidence, there were two or three guns used. The presence of damage on the nose of the .38-caliber bullet indicated that the bullet had struck a hard surface or object at a 90-degree angle. He could not determine if the .38-caliber bullet was fired during the same incident as the .40-caliber bullets.

In closing, the prosecution directly addressed Morris's second shooter theory. It reiterated the testimony from Lt. Amley. The prosecutor argued that Morris was the only shooter. In doing so, it pointed to the Lt. Amley's opinion testimony about the orientation at which the .38 caliber bullet would have to have been fired. The prosecutor posited that the .38 caliber bullet came from some other shooting and had nothing to do with this incident. These arguments eventually triggered an objection from the defense.

The defense argued that the recovered .38 caliber bullet supported Morris's self-defense claim. In the alternative, the defense argued that, on the basis of the reliable evidence presented during trial, the jury should have found him guilty of only voluntary manslaughter, not first-degree murder.

Before closing arguments, the trial court discussed final jury instructions with the attorneys. During the discussion, the trial court asked if the prosecutor wanted the jury instruction on flight, M Crim JI 4.4. The prosecution indicated that it did. Although the defense questioned the trial court's characterization of there being "some evidence that the defendant ran away after the alleged crime," once the court clarified that Morris "sauntered off," but nonetheless left the scene, there was no objection. The court continued with the remainder of the proposed instructions.

During the final instructions, the trial court gave the following instruction regarding flight:

-4-

There's been some evidence that the defendant ran away after the alleged crime. This evidence does not prove guilt. A person may run or hide for innocent reasons such as panic, mistake, or fear.

However, a person may also run or hide because of a consciousness of guilt. You may decide whether the evidence is true, and if true, whether it shows that the defendant had a guilty state of mind.

The trial court also instructed the jury on the elements of the offenses and certain lesser crimes. Regarding the charged crime of first-degree premeditated murder, the court also instructed the jury on and the lesser offenses of second-degree murder and voluntary manslaughter. For the charged crime of assault with intent to commit murder, the court also instructed the jury on the lesser offense of assault with intent to do great bodily harm less than murder. The court also instructed the jury on the defense theory of self-defense.

After the trial court completed its final instructions, and before the jury was excused to begin deliberations, the court asked the parties whether the attorneys were "satisfied with the Instructions as given?" Defense counsel stated, "Yes, Your Honor."

The jury found Morris guilty as charged. This appeal followed.

## II. SUFFICIENCY OF THE EVIDENCE

Morris first argues that the prosecution failed to present sufficient evidence to support his conviction of first-degree premeditated murder. Specifically, he argues there was insufficient evidence of premeditation. We disagree.

We review de novo a challenge to the sufficiency of the evidence. *People v Speed*, 331 Mich App 328, 331; 952 NW2d 550 (2020). When determining whether there was sufficient evidence at trial to support a conviction, we must view the evidence in a light most favorable to the prosecution and determine whether a rational trier of fact could find that the essential elements of the crime were proven beyond a reasonable doubt. *People v Miller*, 326 Mich App 719, 735; 929 NW2d 821 (2019). "[A] reviewing court is required to draw all reasonable inferences and make credibility choices in support of the jury verdict." *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000).

First-degree premeditated murder requires proof that the defendant intentionally killed the victim and that the act of killing was premeditated and deliberate. *People v Ortiz*, 249 Mich App 297, 301; 642 NW2d 417 (2001). Premeditation and deliberation require "sufficient time to allow the defendant to take a second look." *People v Anderson*, 209 Mich App 527, 537; 531 NW2d 780 (1995). "That is, some time span between the initial homicidal intent and ultimate action is necessary to establish premeditation and deliberation, but it is within the province of the fact-finder to determine whether there was sufficient time for a reasonable person to subject his or her action to a second look." *People v Oros*, 502 Mich 229, 242; 917 NW2d 559 (2018) (quotation marks and citation omitted). "While the minimum time necessary to exercise this process is incapable of exact determination, it is often said that premeditation and deliberation require only a brief moment

of thought or a matter of seconds[.]" *Id*. at 242-243 (quotation marks, brackets, and citations omitted).

A jury may infer the defendant's state of mind "from defendant's conduct judged in light of the circumstances." *Id*. at 243 (citation omitted.). See also *Ortiz*, 249 Mich App at 301 ("The elements of premeditation and deliberation may be inferred from circumstances surrounding the killing.") (Quotation marks omitted). The prosecution can establish premeditation through evidence of "(1) the prior relationship of the parties, (2) the defendant's actions before the killing, (3) the circumstances of the killing itself, and (4) the defendant's conduct after the homicide." *People v Unger*, 278 Mich App 210, 229; 749 NW2d 272 (2008) (providing a nonexhaustive list of factors). "[M]inimal circumstantial evidence will suffice to establish the defendant's state of mind[.]" *People v Kanaan*, 278 Mich App 594, 622; 751 NW2d 57 (2008). "[W]hat constitutes sufficient evidence to support the elements of premeditation and deliberation may vary from case to case because the factual circumstances will vary, but the ultimate answer may be resolved in determining whether reasonable inferences may be made to support the fact-finder's verdict." *Oros*, 502 Mich at 243-244.

The evidence in this case, viewed in a light most favorable to the prosecution, contradicted Morris's argument that he did not act with premeditation and deliberation. Specific to the circumstances leading to the shooting, the prosecution presented evidence that Anderson was slowly walking backward down the sidewalk backing away from Morris, with nothing in his hands. While they spoke outside the bistro, the unarmed Anderson told Morris to "Leave me alone" and "I'm done arguing" while continuing to walk away from him. There was evidence that Morris said "something to the effect" of "We have guns," "There's shooters," and "There's no bitches around here," which a jury could interpret as threats or at least anticipation of a shooting. Most critically, regarding the killing itself, Morris then pulled out a gun and, as Anderson was at least 10 feet away, raised his arm, pointed the gun at Anderson, and fired one shot. After missing Anderson (and striking Pruitt) with the first shot, Morris paused for two or three seconds, lowered his gun, raised it again, pointed, and fired two more shots that hit and later killed Anderson. After the shooting, the video depicted Morris unhurriedly walking away before, in his own words, he hopped a few fences and caught a cab. This evidence, viewed in a light most favorable to the prosecution, was sufficient to enable a jury to find premeditation and deliberation beyond a reasonable doubt. A jury could have reasonably inferred from this evidence that Morris deliberated killing Anderson, particularly on the basis of his remarks before the shooting, and the literal second look after his first shot missed. Here, Morris's acts of raising his gun and pointing it at Anderson before shooting, and then lowering his weapon before raising it again and firing additional shots after initially missing his intended target, strongly indicates premeditation and deliberation. His ostensibly unbothered flight compounds this evidence.

Considering the nature and circumstances surrounding the killing, a jury could have rationally inferred that Morris acted on a decided course of action rather than an unplanned impulse. Thus, the evidence was sufficient to sustain Morris's conviction of first-degree premeditated murder.

Morris essentially argues that the evidence was insufficient to sustain his conviction because the prosecution failed to present evidence to show that the killing did not occur in the heat of passion, and because the jury should have believed his version of the events. However, Morris's

challenges, including what inferences could be drawn from the evidence, are related to the weight and credibility of the evidence, which were issues for the jury to resolve. *People v Scotts*, 80 Mich App 1, 9; 263 NW2d 272 (1977). The jury heard from two eyewitness, Elledge and Pruitt, including testimony about Morris's remarks before he pulled out his weapon. The jury also observed video evidence that captured Morris's movements before, during, and after the shooting. Viewed in the light most favorable to the prosecution, a jury could infer that Morris deliberately positioned himself partially behind cover in the minute leading up to the shooting, further indicating that this was not in the heat of passion. The trial court instructed the jury on the lesser offenses of second-degree murder and voluntary manslaughter, as the defense requested. The jury therefore was free to accept or reject the theory of either party in light of the evidence presented at trial, and this Court will not interfere with the jury's role of determining issues of weight and credibility. *People v Baskerville*, 333 Mich App 276, 283; 963 NW2d 620 (2020). Further, Morris's reliance on his own testimony disregards that this Court is required to resolve all conflicts in the evidence in favor of the prosecution, *id.*, that this deferential standard of review is the same whether the evidence is direct or circumstantial, *Nowack*, 462 Mich at 400, and that it is well-established that "[c]ircumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime." *Id.* (citation omitted). It also ignores the very real possibility that the jury simply did not believe his testimony or portions of it. Applying these standards, there was sufficient evidence to enable the jury to find the requisite element of premeditation beyond a reasonable doubt, and this Court will not disturb the jury's verdict.

## III. INEFFECTIVE ASSISTANCE OF COUNSEL

Next, Morris argues that one of his three attorneys—the attorney responsible for investigating and identifying defense witnesses—was ineffective for failing to investigate and call nine proposed witnesses at trial. We disagree.

"Whether a defendant has been denied the effective assistance of counsel is a mixed question of fact and constitutional law." *People v Solloway*, 316 Mich App 174, 187; 891 NW2d 255 (2016). This Court reviews any factual findings by the trial court for clear error, and any constitutional determinations are reviewed de novo. *People v Trakhtenberg*, 493 Mich 38, 48; 826 NW2d 136 (2012). Because Morris failed to raise this ineffective-assistance claim in a motion for a new trial or request for an evidentiary hearing in the trial court, our review of this issue is limited to mistakes apparent on the record. *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012). "If the record does not contain sufficient detail to support [a] defendant's ineffective assistance claim, then he has effectively waived the issue." *People v Davis*, 250 Mich App 357, 368; 649 NW2d 94 (2012).

An ineffective-assistance-of-counsel claim has two parts. *People v Leffew*, 508 Mich 625, 637; 975 NW2d 896 (2022). To establish ineffective assistance of counsel, Morris must first establish that counsel's performance was deficient, which involves consideration of " 'whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.' " *Id.*, quoting *Strickland v Washington*, 466 US 668, 690; 104 S Ct 2052; 80 L Ed 2d 674 (1984). Second, a defendant must also demonstrate that he was prejudiced by counsel's error. To establish prejudice, Morris " 'must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different.' " *Leffew*, 508 Mich at 637, quoting *Strickland*, 466 US at 694. "Reasonable probability means 'a probability sufficient to undermine confidence in the outcome.' " *Leffew*, 508 Mich at 637, quoting *Strickland*, 466 US at 694. Morris has the burden of establishing the factual predicate for his ineffective-assistance claim. *People v Douglas*, 496 Mich 557, 592; 852 NW2d 587 (2014).

Here, at a minimum, Morris's ineffective-assistance-of-counsel claim fails on the prejudice prong. Morris asserts that defense counsel should have called Samuel Bowman, Shavonne Byrd, Germaine Harris, Ianna Borisova, Robert Brandt, Darrell Madison, Darius Blocker, Ernest Jones, and DeLano Ross, who could have supported his claim of self-defense. Decisions whether to call witnesses generally are matters of trial strategy. *People v Payne*, 285 Mich App 181, 190; 774 NW2d 714 (2009). However, defense counsel's failure to investigate and attempt to secure a witness to assist the defense may constitute ineffective assistance. *People v Carll*, 322 Mich App 690, 703; 915 NW2d 387 (2018). Defense counsel has a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 US at 691. Regarding prejudice, "[w]ithout some indication that a witness would have testified favorably, a defendant cannot establish that counsel's failure to call the witness would have affected the outcome of his or her trial." *Carll*, 322 Mich App at 703.

It is apparent that defense counsel was aware of the witnesses Morris identifies on appeal because, as he acknowledges, counsel named each one as a potential witness during trial. Early in the trial, counsel explained that Bowman, Byrd, and Harris would not be called, and their names were removed from the witness list because "they moved, or they were not present for the event that bring[s] us here today." Regarding the six other potential witnesses, who were on Morris's final witness list, counsel could have chosen not to call them for various reasons, including that their testimony would not have been supportive or even harmful to the defense. Although Morris asserts that the proposed witnesses' testimony would have been exculpatory, he has not provided any witness affidavits or identified any other evidence of record showing what testimony the witnesses would have provided if called. Absent such a showing, Morris cannot establish that he was prejudiced by defense counsel's failure to call them as witnesses. *Nix*, 301 Mich App at 207. We can resolve this issue on this ground without needing to address whether defense counsel's investigation was deficient.

## IV. PROSECUTOR'S CONDUCT

Morris argues that he is entitled to a new trial because the prosecutor improperly questioned him during cross-examination and argued facts not in evidence during closing argument.[3] We disagree.

---

[3] In his appellate brief, Morris uses the phrase "prosecutorial misconduct." Although "prosecutorial misconduct" has become a term of art in criminal appeals, the term "misconduct" is more appropriately applied in extreme instances where a prosecutor's conduct violates the rules of professional conduct or constitutes illegal conduct. *People v Cooper*, 309 Mich App 74, 88;

"In order to preserve an issue of prosecutorial misconduct, a defendant must contemporaneously object and request a curative instruction." *People v Bennett*, 290 Mich App 465, 475; 802 NW2d 627 (2010). Morris preserved his claim that the prosecutor argued facts not in evidence during closing argument by stating that the .38-caliber bullet was unrelated to this incident and that Morris was the only shooter. We therefore review this preserved claim of misconduct by reviewing the challenged conduct in context to determine whether Morris received a fair and impartial trial. See *People v Brown*, 294 Mich App 377, 382-383; 811 NW2d 531 (2011). However, Morris did not properly preserve his claims related to the prosecutor's cross-examination questions. He did not object to the questions asking whether he went to the police immediately after the shooting and, although he objected to the question whether he told anyone before trial that someone had shot at him, the trial court sustained the objection and Morris did not otherwise request a curative instruction as required to preserve a claim of prosecutorial misconduct. See *Bennett*, 290 Mich App at 475. Therefore, we review the unpreserved claims of prosecutorial misconduct for plain error affecting defendant's substantial rights. *People v Roscoe*, 303 Mich App 633, 648; 846 NW2d 402 (2014).[4] This Court will not reverse if the alleged prejudicial effect of the prosecutor's conduct could have been cured by a timely instruction. *People v Watson*, 245 Mich App 572, 586; 629 NW2d 411 (2001).

## A. CROSS-EXAMINATION

Morris argues that the following questioning by the prosecutor undermined his presumption of innocence and his right to remain silent. Specifically, he challenges the prosecutor's questions about his flight from the shooting, why he did not go to the police, and whether he told anyone prior to trial that there was another shooter present, a critical aspect of his self-defense theory. Morris contends that the prosecutor improperly elicited that he did not go to the police immediately after the shooting, "implying it showed [defendant's] guilt." However, he fails to note that it was defense counsel who first questioned him on this matter during direct examination. As stated, the following exchange occurred:

---

867 NW2d 452 (2015). Therefore, Morris's claim of error may be more fairly characterized as a claim of "prosecutorial error." *Id*.

[4] As stated in *People v Brown*, ___ Mich App ___, ___; ___ NW2d ___ (2024), slip op at 3 (N. P. HOOD, J., concurring):

> To obtain relief under the plain-error rule, a defendant must prove that (1) an error occurred, (2) the error was plain, and (3) that the plain error affected substantial rights—in other words, the error affected the outcome of the proceedings. *People v Anderson*, 341 Mich App 272, 280; 989 NW2d 832 (2022). If a defendant satisfies these three requirements, we must determine whether the plain error warrants reversal, in other words, whether it seriously affected the fairness, integrity, or public reputation of the judicial proceedings independent of the defendant's innocence. *Carines*, 460 Mich at 763-764. Sometimes identified as a fourth prong of plain-error analysis, this last step conceptually overlaps with the third prong. *Davis*, 509 Mich at 75-76.

*Q.  Why didn't you go to the police station?*

*A.  I don't too much trust the police too much, wrongful convictions and stuff going on.  And I'm a felon, so I already knew that was going to be a strike against me.  [Emphasis added.]*

Morris has not explained why it was improper for the prosecutor to explore this same matter on cross-examination.  He has not offered any authority applicable to what occurred in this case.  Morris cannot "assign error on appeal to something his own counsel deemed proper at trial." *People v Green*, 228 Mich App 684, 691; 580 NW2d 444 (1998).

Regarding the prosecution's last question ("And you never tell anyone until today in court in front of a jury, right, that someone shot at you?"), to the extent that it could be considered improper, Morris has failed to establish that it affected his substantial rights.  More critically, Morris fails to acknowledge that the trial court sustained defense counsel's objection to this question.  And although the defense did not request a curative instruction, the trial court instructed the jury in its final instructions as follows:

At times during the trial, I've excluded evidence that was offered, or stricken testimony that was heard.  Do not consider those things in deciding the case.  Make your decision only on the evidence I let in and nothing else.

. . . .  To repeat once more, you must decide this case based only on the evidence admitted during this trial.

The trial court's instructions were sufficient to dispel any possible prejudice and to protect defendant's substantial rights.  *People v Long*, 246 Mich App 582, 588; 633 NW2d 843 (2001).  Juries are presumed to follow their instructions.  *People v Breidenbach*, 489 Mich 1, 13; 798 NW2d 738 (2011).  Morris has not presented any basis for overcoming the presumption that the jury followed these instructions.

## B.  ARGUING FACTS NOT IN EVIDENCE

Morris also argues that the prosecutor argued facts not in evidence by stating during closing argument that the .38-caliber bullet that police recovered outside of a nearby ice cream shop, which was near the bistro, was unrelated to this shooting and that Morris, who used a .40-caliber weapon, was the only shooter.  The prosecutor argued:

Now, ladies and gentlemen, I would also submit to you that the defendant is the only shooter in this case.  And we see that based on Mr. Pruitt's actions, also in addition to the man wearing the vest on the corner.

Now, you see Mr. Pruitt.  You can see his head at the bottom of the screen.  He walks up Lesure.  And then we see the defendant's gun go off.

And after you see the muzzle flash of the defendant's gun is when you see Mr. Pruitt duck down and run to the left.

-10-

* * *

Now, ladies and gentlemen, I also would submit to you that the evidence presented in this case, the physical evidence that we saw from the evidence technicians, which show that there were only one set of—that the defendant was the only one firing a weapon on this particular night.

We see in the evidence tech pictures the three casings that were recovered from the corner.

1, 2, and 3, [a firearm and toolmark expert] told us were fired from a .40 caliber Smith & Wesson. The bullet pulled out of Mr. Pruitt's leg was only from a .40 caliber Smith & Wesson. And the bullet from down the street, [the expert] tells you they have those similar characteristics and stria from Item No. 1 being a .40 caliber Smith & Wesson.

Now, we also heard evidence that there was another bullet pulled from this corner next to the dairy building. We see that in placard No. 7.

Now, ladies and gentlemen, if you see where placard No. 7 is on that dairy building, you can kind of see where it would be off the corner on the video behind it, a little ways off the corner of that building.

Now, [the expert] also told you that that bullet, based on the damage, was either shot—it was shot at a 90-degree angle—either it was shot directly into the ground or directly at a wall.

Now, if someone—and we see where No. 7 was collected—now, if that bullet was fired directly into the ground, wouldn't you see someone standing there firing the weapon directly into the ground? And there's no one there.

Or wouldn't you see someone firing it directly into the side of the building? But you don't, because, ladies and gentlemen, *I would submit to you that this is an old bullet from some other shooting, and it is unrelated to this homicide case.*

*There was one gun on this scene. There was one shooter on the scene, and that was the defendant, Faraj Morris.*

* * *

Now, you heard from the two responding officers. They told you that they searched that location, of [sic] sergeant showed up with two other responding officers, who took over the scene. And then the two evidence technicians searched that scene, and there were no casings recovered anywhere but the corner, three casings from the corner that were all fired from the same weapon.

Those are the only shell casings that were recovered from the scene, ladies and gentlemen. And I would submit to you that is because there was one shooter

-11-

that night, and it was the defendant. There was no second shooter. [Emphasis added.]

Prosecutors may not make a statement of fact that is unsupported by the evidence, but they may argue reasonable inferences arising from the evidence to the extent that the inferences relate to the prosecutor's theory of the case. *People v Dobek*, 274 Mich App 66, 106; 732 NW2d 546 (2007). Here, there was evidence that three .40-caliber shell casings were recovered from the adjacent side street outside the bistro and a .40-caliber bullet was recovered from Pruitt's leg, and that all of these items were consistent with being fired from the same weapon. Although police found a .38-caliber fired bullet near the scene of the shooting, it was clear from the testimony that the officer in charge, the forensic technician, and the firearm and toolmark expert could not determine whether the .38-caliber bullet was fired during this incident. However, the expert explained that the presence of damage on the nose of the .38-caliber bullet indicated that it struck a hard surface or object at a 90-degree angle. There was no evidence that anyone shot a gun at any hard object during this incident. There also was no evidence that a gunshot was fired toward the ice cream shop. The fact that the police did not locate a casing for the .38 caliber bullet further supports this. Morris testified that he was standing near the corner outside the bistro and he testified that Elledge "[f]ired towards him." Furthermore, both prosecution eyewitnesses, Elledge and Pruitt, testified that Morris was the only person with a gun and the only person shooting during this incident. Thus, the evidence supported a reasonable inference that the .38-caliber bullet was unrelated to this incident. The inference from the evidence that the bullet was unconnected to this incident relates to the prosecutor's theory that Morris was the only person who possessed and shot a gun, and thus was not acting in self-defense when he shot Anderson. Viewed in context, the prosecutor's argument was not improper.

To the extent that the prosecutor's remarks could be perceived as improper, Morris is still not entitled to a new trial. In its final instructions, the trial court instructed the jury that the lawyers' statements and arguments are not evidence, that the jury was to decide the case only on the basis of the properly admitted evidence, and that the jury was to follow the court's instructions. The trial court's instructions were sufficient to dispel any possible prejudice and to protect Morris's rights. *Long*, 246 Mich App at 588. Morris has not presented any basis for overcoming the presumption that the jury followed the court's instructions.

V. FLIGHT INSTRUCTION

In his last claim, Morris argues that the trial court erred by giving M Crim JI 4.4., the jury instruction on flight, concealment, escape, or attempted escape, because there was no evidence to support the instruction. However, during discussions regarding the jury instructions, the parties expressly discussed the flight instruction, and none of Morris's three attorneys objected to the instruction being given. None of the attorneys objected to the jury instructions, including the flight instruction, as they were being given. And critically, after the trial court completed its final instructions, it asked the attorneys whether they were "satisfied with the Instructions as given?" Defense counsel stated, "Yes, Your Honor." By expressly approving the court's jury instructions, Morris waived appellate review of this claim of instructional error. *People v Kowalski*, 489 Mich 488, 504; 803 NW2d 200 (2011). Morris's waiver extinguished any error, leaving no error to review. *People v Carter*, 462 Mich 206, 216; 612 NW2d 144 (2000).

-12-

We affirm.

/s/ Allie Greenleaf Maldonado
/s/ Sima G. Patel
/s/ Noah P. Hood